WILEY and GAYLE *versus* WHITE and LESLEY.

1. *Semble*—The act of 1822* on the subject of authorising sales by an administrator or executor, of the real estate of a deceased person, though it did not repeal the act of 1803,† directing a sale of the lands of a testator or intestate,‡ yet, superseded the provisions of the latter act.
2. Under the statute of 1803, the County court had no power to order a sale of the lands of a testator or intestate, without proof, that the representative had given the notice required by the act.
3. So, the failure of the representative to give bond, as the act directs, held to avoid the sale of lands made by him.
4. As a general rule, the delivery of the possession of real estate by the grantor, to the grantee, is evidence of title, so far as to prevent the recovery back of the purchase money, until eviction: and, the vendee cannot defeat the recovery of the consideration money, on the ground of want of title, in the vendor.
5. In such case, a vendee is bound to ascertain the title sold; and, if he choses, may protect himself, by proper covenants.
6. But, in the case of a sale of lands by an administrator or executor, under the statute, the rule is otherwise: they act as trustees, who sell the title of others; and, if they do not strictly pursue the authority under which they act, the sale made by them is void: and the possession held under them, by a vendee, is tortious; and the latter is liable to the heirs, for *mesne* profits.
7. In such case, the vendee may legally resist the recovery of the purchase money, without proof of eviction.

This was an action of assumpsit, in Dallas Circuit court, instituted by the defendants in error, as the administrators of Edmund Lane. The cause of

---

*Aikin's Digest, page 180, sec. 16.
†Toulmin's Digest, page 327, sec. 23.
‡The act of 1803, referred to in this case, is not embraced in the D'gest of Aiken. It is presumed, therefore, that it is now no part of the law of the land, except so far as it is incorporated into other acts, retained in Aiken's Digest.

action was a prommissory note, for the sum of nine hundred and ten dollars, which had been executed in part consideration of the purchase of real estate, of the intestate, sold by the administrators.

The declaration was in common form, and the general issue pleaded.

The proceedings under which the sale was effected, were those prescribed in the statute of 1803 : and, under which the Orphans' court decreed a sale, which was effected accordingly.

In the court below a judgment was rendered for the plaintiffs in the cause ; and, to reverse that judgment exceptions were taken, and the cause brought here, by writ of error.

The bill of exceptions set forth the petition, at length, under which the sale had been decreed ; and the orders of the Orphans' court in relation thereto.

The first order, after reciting, that the administrators had filed a statement under oath, setting forth the insolvency of the estate, and, that it appeared, that the intestate owned the real estate, described, ordered a citation to all concerned, and publication, &c.

Another order, after premising, that it appeared, that due notice had been given by publication, in the " Cahawba Press," and no objection having been made to, or cause shewn, why, said lands should not be sold ; and that it would subserve the interest of all concerned, to sell—decreed a sale, by commissioners, upon six weeks' notice, and on a credit of one year.

It was not shewn, that any report had been made of the sale; or, that a bond had been given by the administrators.

During the progress of the trial, the defendants

prayed the court to charge the jury, that the act of 1822, on the subject of a sale of the realty of a deceased person, repealed that of 1803—which the court refused, saying that the acts were in *pari materia*, and that the provisions of one did not repeal the provisions of the other, where not repugnant. That it was then asked of the court, to charge, that, to entitle the plaintiffs to recover, the jury must be satisfied, that the sale, if made, under the act of 1803, was preceded by notice to the heirs, by advertisement in three public places, in the county, or publication, in a newspaper, printed in the State; and, that the administrator had given bond, as required by the act, and had reported his acts to the county court. The court refused so to charge, but instructed the jury that slight irregularities in the proceedings did not avoid the sale.

It was further asked of the court, by the defendants, to instruct the jury, that, unless all the requisites of the statute were strictly complied with, the plaintiffs could not recover; and that when the defendants made out a *prima facie* case of irregularity, it devolved upon the plaintiffs to show a perfect conformity with the statute. The court refused so to charge, but informed the jury, that if the defendants had received a deed from the plaintiffs for the land, and had enjoyed possession, there was not a total failure of consideration.

*Vandegraaff*, for plaintiff—*Hopkins* and *Ellis*, contra.

TAYLOR, J.—The decision which was made in this case, when it was in this court before,[a] renders [a]2Stew.R. 329

it unnecessary to investigate several of the points which have been elaborately and ably argued by counsel. It has been repeatedly determined, that we would not examine a point which had been once decided by us in a cause, if the same case is brought before us a second time.

The opinion of the court, delivered in this case, heretofore, contains the following language:

" The county court, is a court of special and limited jurisdiction; its authority to order or decree the sale of the real estate of testators and intestates, is not derived from the common law, but is created by statute, and, to render the sale valid, all material requisitions of the statute must be complied with."

The principal difficulty in this case is, to determine what is before us for revision; there is but little, in applying the foregoing opinion to the record, were we to examine it without regard to the assignment of errors; that assignment relates exclusively to the bill of exceptions. It appears from the bill of exceptions, that the plaintiffs in error (the defendants below,) moved the court to give the jury several distinct charges, all of which were refused; and these opinions of the court, as well as those contained in the charges given, were excepted to. The court was requested, first, " to charge the jury, that the act of 1822, authorising the sale of real estate, by administrators, upon the insolvency of the estates of intestates, repealed the act of 1803, on the same subject. This charge the court refused to give, and ruled that there were several acts which should be considered in *pari materia,* and did not repeal the act of 1803, except so far as their provisions were repugnant."

Juries are impanneled to investigate facts. Sup-

pose the charge had been given as requested, what would it have effected? It was asking the court to inform the jury that they must give construction to the law of 1822, and not to construe the law for them. It was, in effect, a mere abstract charge which was requested, and nothing more. But, even had it been proper to charge in the abstract manner request-ed, by the plaintiffs in error, the charge given by the court was correct. There is no clause in the act of 1822, repealing that of 1803 ; much of the act of 1803, contains provisions in no way inconsistent with that of 1822: for a subsequent statute to repeal a previ-ous one, by implication, there must be a repugnancy in the one to the other, and, therefore, the charge was right, as given. It is objected, however, that the court left it to the jury, to determine whether such repugnancy existed, which it was the peculiar province of the court to determine. This would be very true, had not the counsel asked a charge which, if given as requested, would have devolved the duty upon the jury : The court responded to the request of the counsel.

The plaintiffs in error also requested the court to charge the jury, " that to entitle the plaintiffs [the defendants in error,] to recover, they must be satis-fied, if the plaintiffs sold under the act of 1803, that they made publication, by putting up advertisements in three public placees in the county, in which the land lies, and also by publishing the said notice in a paper published in the State. That they also gave bond and security under said act of 1803, and, also, that they reported their proceedings of the county court, in pursuance of said order, otherwise they could not recover. This charge the court refused to give

but told the jury that slight irregularities in the proceedings did not avoid the said sale."

I understand the effect of the charge to be this' Although the proceedings were had under the act of 1803, the failure to put up advertisements in three public places in the county, in which the land lies; also, the failure to give bond and security, and to report the proceedings to the court, in pursuance of the order of sale, were slight irregularities, which would not affect the right of the payees to recover.

It is not necessary to enter into an examination of the effect of the act of 1822 upon that of 1803, to decide the question made by this exception; it seems to be admitted that the proceedings took place under the act of 1803. It was determined by this court, heretofore, that they could not be sustained, if they were had under the statute of 1822, and the great object of the defendants in error, upon the trial in the circuit court, which took place after the case was remanded, seems to have been to bring the proceedings of the county court, within the provisions of the act of 1803.— Were it necessary to decide whether a sale of real estate could now be made by a representative under the act of 1803, my opinion would be that it could not; that the provisions of that act on this subject, are superseded by those contained in the act of 1822, which throws several additional guards around the interests of the heirs, especially such as are infants, who should always receive the peculiar protection and favor of the courts; and that it could not have been consistent with the intention of the legislature, while the propriety of these additional securities to the rights of infant heirs is admitted, to leave it optional with the persons against whom it is intended to afford the protection, to give it or not.

It may be well to compare the irregularities specified in the charge which was requested by the plaintiffs in error, with those on account of which the case was reversed when in this court before.

It will be recollected that it was then determined, that the record contained complete evidence that the county court, in ordering the sale, proceeded under the act of 1822. That statute, among other things, required that, "where a sale of the estate shall be ordered, or decreed, by the court, commissioners shall be appointed, in the order, or decree, with directions to sell the estate, either for money or on credit, as may be most just and equitable, and to report to said court, at the time limited in the order or decree. That the said court shall, upon the coming in of the report of the commissioners, render a final decree in the cause; and if the terms of the sale have been complied with, by the purchaser of the estate, the commissioners shall be directed by such final decree, to convey the estate sold, to the purchaser."

In deciding the case in 1830, this court said, "one very material requisition of the statute is, that the commissioners shall make their report to the court, on which the court shall make its final decree, directing them to convey to the purchaser. In order to give effect to the proceedings of the court, and reality to Wiley's title, this was essential; but which was not done, and the omission is fatal. Wiley's title, therefore, was wholly defective and void, unless the omission can be supplied, so as to complete it." The opinion goes on to show that the omission cannot be supplied.

The act under which the above decision was made, required personal notice of the proceedings to be

served upon the heirs, and that guardians *ad litem,* shall be appointed to those who are under age, and requires them to deny the necessity of a sale, so as not to dispense with any proof whatever, on the part of the representative. The parties in interest, were then all in court. The act of 1803, under which it is contended, by the defendants in error, this proceeding took place, and to which the charge requested, had a direct reference, does not require that personal notice shall be served upon those interested in the real estate, which it is intended to sell. Its provisions on the subject of notice, are as follows : after requiring that the representative, when he discovers that the personal estate is insufficient to pay debts, shall exhibit a true account of the estate and debts, as far as he can discover the same, to the orphans' court, or chief justice thereof, it proceeds thus :

"And the said court, or chief justice, shall, thereupon, cause a citation to issue, directing all persons interested in the lands, tenements, and hereditaments of the deceased, to appear before the orphans' court, at a certain day therein to be named, to show cause, &c.; which citation shall, immediately thereafter, be set up in three of the most public places in the county in which such lands, tenements, or hereditaments be, for the space of thirty days, and be published, for the same term of time, in one of the public newspapers in this State."

Suppose no publication were made in a newspaper, in conformity with this provision, and the notice was advertised in three public places, as required by the act, would this be a sufficient compliance with its requisitions? It is impossible to determine which of the two modes of advertising would, most proba-

bly, bring a knowledge of the proceedings home to the persons interested : that would depend upon several circumstances. If they resided in the same county, and the paper was published out of it, the written notices would be most apt to be seen by them. Did they reside out of the county, but near the place at which the newspaper was published, the printed notice would most probably meet their eyes; and if they lived at a distance from both, it would generally be accidental that they would receive any information from either. But, because this is the case, would it be right to consider it unnecessary to give notice at all?

It will be remembered, that the court, in this case, heretofore decided, that all material facts must appear upon the record; and the only inquiry is, are any of the acts required to be done, and which do not thus appear, material? If no advertisement had been published in a newspaper, nor any other notice given, would this have been fatal to the proceedings?

The act prescribed this method of citing the persons interested, to appear and contest the application of the representative. That of 1822, requires the service of personal notice. Suppose no such personal notice is served, under the last mentioned act; what would be the effect? Surely, it would be a more important departure from the course prescribed by the statute, than a failure on the part of commissioners, appointed under it, after they have sold, in conformity with the order, to make a report of their proceedings. In the latter case, proof that the purchaser had complied with the terms of the sale, and that the commissioners had, thereupon, made a deed,

though without an order and decree of the county court to that effect, would seem to secure the interest of all concerned, though in an irregular manner. But if service of process has not been effected, it would be difficult, and, in many instances, might be impossible, to show the extent of the injury which had been received by those who ought to have received the notice. It would, also, leave facts open for subsequent, and, it might be, repeated investigation, which ought to be settled, once and forever, by the proceeding in the county court. If the service of the process be so important, under the act of 1822—making the several advertisements, which are intended to have the same effect, must be equally so, under the act of 1803, and if one mode of advertising, required by the statute, can be omitted, and pronounced too slight a departure to affect the substance of the proceeding, I do not see why both may not. The act evidently substitutes these advertisements for personal service of the citation; the policy of any such substitution has been denied by the legislature, by the subsequent enactment, and is, at least, too much a matter of doubt to authorise this court to say that we will sanction so great a departure from the requisitions of the statute as has been made in this instance.

It is insisted, however, by the counsel for the defendants in error, that the omission, to make it fatal, must be in the proceedings of the court. That if the court has proceeded regularly, and made every necessary order, it will be presumed that every thing was done in conformity with those orders. The soundness of this distinction is not perceived. The court was not authorised, according to the act of 1803, to order a sale of the lands, until the time at which

WILEY and GAYLE vs: WHITE and LESLEY.

the parties interested, were cited to appear, by the advertisements published as before mentioned; and without proof that the representative had performed his duty, in that respect, no such order could be legally made.

The failure of the administrator, to give bond according to the requirements of the thirtieth section, would also be a fatal omission. That section provides, that "every executor, administrator or guardian, empowered by the Orphans' court, or Supreme or Superior court, in chancery, to sell the lands," &c. " of their testator, or intestate," &c., " shall, before he or she obtain the order of sale from the office of the register or clerk, enter into bond, with sufficient sureties, to the chief justice of the Orphans' court of the proper county, that he or she will observe the rules and directions of law, for the sale of real estates," &c.; "and, that he or she will, well and truly account for the proceeds of said sale; and that the same shall be disposed of, agreeably to the rules of law."

The execution of this bond, is by no means a formal matter. An administrator has no power, as such, to intermeddle with the real estate of the intestate; nor has an executor, unless the will expressly vests him with the right, any power to sell the real estate. In entering into the ordinary bonds, therefore, for the faithful discharge of their duties, when they take upon themselves their several trusts, the value of the personal estate alone is estimated, in determining the amount in which the bonds are taken. When they receive the additional authority to sell the real estate, there is no security for the due application of the proceeds, unless the bond be giv-

on in conformity with the provisions of the section just recited. Therefore, unless such bond be given, the heirs may insist on their title to the land, as the only security they have, for their rights.

In reply to all these objections, it has been contended, by the counsel for the defendants in error, that, although the defects in the proceedings may be such, that, at law, the title of the heirs is not divested, yet, this forms no defence to this action, because a court of chancery will compel the heirs to convey; that the payment of the debts of the decedent with the proceeds of the land, by the administrators will form a consideration, sufficient to enable the plaintiff in error, (Wiley,) to appeal to chancery for relief.

It has been well replied to this, that it was not intended, in contracting for the land, to purchase a law suit.

But, how can this court know, that the administrators will pay the debts of the decedent, with the proceeds, should they collect them? We have not the power, to require of them security, that they will do so. Had a bond been executed, as required by the section before recited, there would have been more plausibility in this argument; but, if this fact should not exist in favor of the purchaser—that is, if the representatives should not pay the debts of the decedent, with the purchase money; or, which is the same, in effect, if he should be unable to prove it— where, then, would be the ground, upon which he could ask relief, at the hands of a chancellor?

It is believed there was error, in refusing the charge, asked by the plaintiffs in error, in the second branch of the bill of exceptions.

It is deemed unnecessary to examine the other

points, made by the bill of exceptions.    The charges asked are too indefinite ; and there was no error, in refusing to give them.

There remains but one point to be considered : it is the effect of possession, in the purchaser, (Wiley.)

It appears, that after the sale by the administrators, Wiley took possession of the land, in which possession he has never, for aught that is contained in this record, been disturbed.    It is insisted, that, as possession was delivered, there can not have been an entire failure of consideration ; and that, therefore, no defence can be made in this action for the consideration money.

The general rule, that the delivery of possession of real estate, by the grantor, to the grantee, is, of itself, such an evidence of title, as will prevent the latter from sueing the former, to recover back the purchase money, until an eviction takes place ; and that he cannot defend himself in such case, when sued for the purchase money, on the ground of a want of title, in the grantor, is admitted.    In those cases, however, he obtains the title for which he contracted—which is that of the grantor.    He was bound, in common prudence, to ascertain the nature of that title, and if not satisfied with it, to protect himself, by such covenents, as were necessary for his security.    The deed of conveyance is valid* and obligatory between the parties, and the grantor is liable to respond in damages, for any breach of covenants he has entered into.

Very different is the situation of the parties, in the case before us.    The grantors were trustees, who were selling the titles of others.    Their authority was restricted to the powers which were confided to

them, by the laws under which they were acting. The conveyance made by them, must have been made in their fiduciary character; and no recovery could be had against them, individually. If they did not strictly pursue their authority, their acts were void, and left the parties in *statu quo:* the possession delivered by them, they had no right to give: as administrators they had no control over the real estate—therefore, such possession was tortious, and the purchaser remains liable to the heirs, for *mesne* profits.

This was the express decision of this court, when the case was formerly before it. The court then said—" Wiley purchased, the land, and not the possession, which formed no part of the consideration; and it was not incumbent on him, in order to resist the payment of the money, to offer to place the vendor in *statu quo,* or to be evicted by a title paramount, when the title was totally defective, and there was an entire failure of consideration. It seems, that this principle applies in cases, only, where there is a partial failure of consideration, or, where it is possible for the vendor, yet, to make a good title, or, when the vendor has covenanted for a good title, with the vendee. But it can have no application, where a bad title is derived, through the medium of a court of competent jurisdiction, and without a possibility of making that title good. If he has enjoyed the benefit of possession, he may be evicted by a rightful owner, and will be accountable for rents and profits."[a]

a2Stew.R 335

This language is too plain to require explanation. The judgment must be reversed and the cause remanded.

SAFFOLD, J., not sitting.